When I was coming up, I enjoyed a show on television called The Twilight Zone. And I know that although many of you have heard of it and might not have seen it, you might be feeling it at the moment. But let me just say first to all counsel and all affected, thank you very much. I mean, you, I believe, understand that we had a technical difficulty. You're the most severe source that requires us to do this again. And I know it might be difficult. The thought might be, I said that, but nobody knows you said it. So you've got to say it again. So we're going to ask some, but not all, of the similar questions. And we hope that you'll be rejuvenated sufficiently to give us some enthusiastic responses. And rather than wait until the end, I just want you to know that we, as a panel and as a court, are very aware of the time parameters that are involved, and we are working with the library. Good morning, Your Honors. And may it please the Court, David Thompson for the plaintiff appellants. Your Honor, with the Court's permission, I'd like to reserve three minutes for rebuttal. Of course, sir, go ahead. Thank you so much. And so I would like to, rather than retracing the grounds in our briefs about Heller and strict scrutiny, which I hope to have time to get to, but I want to go right to prong two, step two of Marzarella and intermediate scrutiny, and provide the Court with two independent legal reasons why we win, even under the defendant's preferred legal standard. And the first relates to McCullen and Bruney. And those cases require a rigorous examination of the state's decision-making process. Bruney states, quote, The government must show either that substantially less restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason, close quote. McCullen adds, It is not enough for the government simply to say that other approaches have not worked. Rather, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests. The fact that those are arising out of the First Amendment context, should that cause us to look at it differently? Because it's an articulation in First Amendment land not similar to the way it's been articulated, and I'm talking about intermediate scrutiny in the Second Amendment case. Well, first let me quote Marzarella, which said, quote, Heller itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. But that quote is not one that we should read to say that it's a wholesale placing of all of the rationale and test of the First Amendment on top of the Second Amendment. I agree with that. That would be over-reading that statement, but it does say the principles. It's more than just which tier of scrutiny. And moreover, if we look across intermediate scrutiny, we see that what McCullen and Bruni say is not confined just to the First Amendment. We look to equal protection and intermediate scrutiny. We see that Justice Ginsburg in the VMI decision engaged in a thoroughgoing, searching, de novo review of the alternatives and the explanations and the rationale without deference. And that's the sort of searching, heightened scrutiny that you see across intermediate scrutiny. Intermediate scrutiny only comes into play, as far as we can tell, in three enumerated rights. They are, number one, the free exercise, free speech, and the equal protection clause. And in all three, when you've got a distinction between strict scrutiny and intermediate scrutiny, you do, the courts, apply. Yes? Well, I wanted you to finish your thoughts. No, no, that's fine. Please. Okay. What I was going to say is, as you've articulated that we should look to Bruni et al. to judge what the state has come forward with, what should we think about as the quantum of proof? Are you saying because they didn't do, you know, detailed survey work over extended periods of time, that we should disregard it? I mean, you know, they did what they did. You say it's inadequate. How specifically is it inadequate? It's inadequate in a number of respects, Your Honor. There is not a word, not one word, about a myriad of different alternatives that could have been considered and worked. Were not, number one, a ban on assault weapons. Not a word about that. Number two. Well, why would you do that if you already have a ban on assault weapons? Well, because they have to look and see, will there be any marginal, incremental value? We're restricting a right, and so in order to push it further, they need to have some rationale why the rules that are in place are not enough, particularly in light of their 28-year history. Isn't what happened legislatively in New Jersey evidence that they have? They looked at 10 before, and they stopped at 15. Based on the information that they've gathered over time, they're now seeking for it to go from 15 to 10. The information they've gathered over time, Your Honor, with respect, there is no information they've gathered over time. There are only four instances in all of American history where someone has committed a mass shooting with a 15-round capacity magazine. I'm so sorry. I'm going to interrupt because that's not what I meant. Okay. What I meant is the other sort of empirical data, if you will, is the experience of other states. Other states have gone to 10 rounds. Why isn't that part of the totality of information that they've looked at? And, Your Honor, that is totally – they can look to the experience of other states. And what we see in the other states is that there is a very high circumvention rate. Eighty-one percent of the time in the states that have banned these, we see mass shooters circumventing the new limit and going out and using 30-capacity magazines. And that's in the record of this case. So then you're from your position then because it's been ineffective in higher quantities, there should be no effort to try to reduce the lethality that a large-capacity magazine permits to occur? It's under Bruni and McClellan and VMI and every manifestation of intermediate scrutiny. It's their burden to show that there weren't less restrictive alternatives that were considered and that won't work. And those fall into two separate categories. So Category 1 is they need to show that what they've got thus far isn't enough. And what they have thus far is a ban on assault weapons, a ban on carrying these magazines outside of the home, and a ban on more than 15. They also need to show that there aren't less restrictive alternatives that they could have considered, like background checks. Counselor? Yes. I don't take their burden to be that there be no circumvention. I don't take you to be arguing that. And I take the core of their logic to be, okay, we have restrictions outside the home, but in the home, Mr. Donohue and others testify, magazines are stolen. You know, criminals get them unlawfully. Even people who are law-abiding turn lawless or go crazy or something. So even if these – why are these alternatives mutually exclusive? If this would restrict – if they could prove, if they had studies, that this would restrict shootings further, wouldn't that be enough to satisfy intermediate scrutiny, even if other measures would also add some delta on top of that? Well, I don't think so, respectfully, Your Honor. First of all, they don't have those studies, as their own expert conceded and as the district court found. But moreover, what McClellan and Coakley are teaching is that there's some less restrictive alternative that would have worked. They need to at least have considered that, and they need to have good reasons to show. And they've done nothing. There's not a word in this record about background checks. Can I ask you about – I know you want to go to background checks and other less restrictive means, but here's the help that I need. As I understand it, this mechanical block, if you will – I don't know what the correct nomenclature is, but I'm going to use mechanical block – that you would use to modify it from a 15 to a 10 is a de minimis cost and is done rather quickly and easily. So I don't understand – you know, you say less restrictive. I understand theoretically why it's an imposition, but I'm trying to figure out just practically speaking, why is it something that isn't just sort of a de minimis insertion and you're done? It's not the mechanics of it that's the burden, Your Honor. It's the tactical advantage. That's their whole case. Their expert said there was a tactical advantage. That's the whole premise behind this is that there's a tactical advantage that mass shooters enjoy by having these firearms. But I thought that your expert said that there was no empirical evidence that in the defense of gun use – this is all about self-defense in the home – that there isn't evidence that 10 bullets are used in that circumstance. I believe that was – he said there's no empirical evidence concerning that. No, he didn't say that. But their expert pointed to a 0.5 percent rate, and he, using his estimates of defensive gun use, said that that's 4,663 instances a year that one would expect. I think we're talking about two different things. I'm talking about in a single episode. My understanding from his report or testimony was that he had no empirical evidence that in an episode of defensive gun use, 10 rounds are discharged. I believe there was other evidence in the record that said it was more than two to three rounds might have been discharged. Well, the two to three was an average. I just want to make sure we're not talking about different things. We're not talking about different things. I'm not talking about the episodes of defensive gun use. I'm talking about what happens during defensive gun use because I think what you said, what you were telling us is the presence of a large-capacity magazine allows for mass shooters to discharge more weapons, more rounds. And the converse, I think what you were saying is that means this kind of magazine would allow a homeowner to have equal footing. Yes, exactly, which is why Detective Stanton said that when he's on duty, he always likes to have 15 rounds because it's a tactical advantage. And so the question is, are we going to strip law-abiding citizens of that tactical advantage and allow defendants to continue to circumvent it, which we see they do 81 percent of the time? If the right is one to keep and bear, is the keeping part of it limited to actually discharging or just possessing the potential to discharge? Simply possessing, Your Honor, is sufficient. And I do want to answer your question, Your Honor, which is that Professor Kleck, I believe, testified that he couldn't recall an instance where someone had discharged more than 10, but the record is clear there are such instances, even if he couldn't recall it off the top of his head. You're saying that you're representing the record in the home? Their own expert says 0.5 percent of the time in the home. More than 10 are discharged? Yes, and that is 4,663 per year. And so we have- More discharges in the home than what you've characterized as the quantity of active shooting, mass shooting incidents? Yes, Your Honor. And so I want to go to a second reason why we- Here's what I don't understand about your argument. Homeowners, based on the information from both sides, are always going to be at a disadvantage because they're not going to be as skilled, on average, with their weapons. So what is the- You want us to make a decision because you believe, and I don't know that there's any evidence in the record of this, that there's a tactical advantage to a homeowner who has less experience and less skill with 15 as opposed to 10 when the amount of ammunition is determined by how much ammunition the homeowner wants to make? Because as I understand your experts, your experts are saying, look, to put another magazine in is, I believe it's two to four seconds. Yes. And that's true whether you're a skilled police officer or a homeowner. So I'm not sure I'm getting what the distinct disadvantage is to the homeowner. The law limits the LCM from 15 to 10. You want to have four or five LCM 10s to equal your basically three LCM 15s, or however you want to do it. I'm not sure I'm seeing the distinct disadvantage. Okay, so there's a lot in that question. Yes, there is. So let me try to be responsive, if I may. So you started, Your Honor, by saying that, well, law-abiding citizens are at a tactical disadvantage already as compared to criminals because criminals plan the time and the place of their attack. And that's true. Criminals have a tactical advantage in that regard. That's not a reason to give them a further tactical advantage of stripping law-abiding citizens of the magazines that they want to have for whatever reasons. And in addition, the criminals can come with multiple magazines, even if they didn't circumvent, even if they're part of a 19% that don't circumvent. Criminals can come with multiple magazines. If you're asleep in your bed and you grab your firearm next to your bed, you know, now you have to have multiple magazines in every room of your house to defend yourself. It's a tactical disadvantage, and for whatever reason, it cannot be taken. But I want to go to a second independent legal basis why under intermediate scrutiny we have to win, and that is because the district court flipped the burden on us. Can you explain that? Paul, you mentioned that before. Can you explain why did you think the district court put the burden on you and wasn't simply just looking at the evidence and making its conclusion about fit? Yes, well, so he looked at the evidence, and he said, well, I'm going to look at this testimony. And he said, it does not, the testimony that I have heard does not convey what the impact on mass shootings will be of this ban. And then he quoted their own experts saying there's no empirical studies on what the impact of this ban will be on mass shootings. If there's no testimony and there's no evidence from studies showing what the ban will be, the only way I can lose is if the burden's on me because he said there's no testimony, there's no studies that go their way or that speak to this, and so only if the burden has been impermissibly shifted onto plaintiffs can we lose. What I worry about is your argument sweeps so far that no one could ever be the first to pass a new restriction. I agree that more studies could be done here, and we could talk about what's in the record in the CNN study, but in a situation where someone wants to be the first jurisdiction to try a restriction, your logic would suggest that governments can't try it because there hasn't been a study and there aren't going to be data until someone tries something new. In a federalist system, can't legislatures experiment with new things based on plausible reasoning and inference rather than saying something's already been tried? Your Honor, that is not our position. Our position tracks what the Supreme Court, or excuse me, what this court said in Bruny, which is the alternatives were closely examined but were less restrictive and ruled out for good reason. They can be the first if they look at less restrictive alternatives and closely examine them and bear their burden of showing that they didn't follow them for good reason, but here we have the opposite because in addition to the panoply of laws in New Jersey that are on the books, they failed to look at how trying to tighten the mentally ill's access to firearms. But what I don't understand is, first of all, these other alternatives aren't mutually exclusive. Second of all, they do make the point that the bulk of people who commit mass shootings, they obtain the weapons lawfully, they don't have criminal records, a lot of them don't have mental illness diagnoses, they would have passed any background check. Let's at least assume that there's a substantial fraction of mass shooters who satisfy all those criteria. So background checks are not a less restrictive mean for that. I have one for you. Okay. Which is registration requirements which have a renewal period. So every period of time you have to go in and get a new registration and there's another opportunity for the states to ensure. Both are in the same category that the judge has brought up to you. Let's assume they're right that 71% of mass shooters would meet this. Until the previous registration, they appeared to be law-abiding. If there's a substantial group, I don't care if it's 71% or 31%, who would have passed all these background checks and registrations, then what's the less restrictive alternative going to do here? Well, Your Honor, they have to show, it's their burden to show that they carefully consider. Under Bruni, they have to show that they carefully considered it and that they had good reasons. This is not rational basis review where the court can invent for them alternatives and reasoning that never occurred to them. You can search this legislative record and you will not find any consideration of these alternatives. So you're not saying in the abstract they couldn't but they haven't? Yes. I'm certainly saying both. I'm saying that there are a myriad of different alternatives they could have considered and they didn't. Whether they would have good reasons, whether their reasoning would be good enough, we don't know. They didn't engage in it. What else besides background checks is on the table here? You said the 15 capacity limit and background checks for mental illness, for criminal. Are there any other alternatives you say they should have considered that they didn't? There are watch lists for the mentally ill that we're seeing in some places. That's another alternative that doesn't require, you know, during the registration period. Here's what I don't understand. These suggestions are, you know, theoretically good, but they don't respond to the question, which is if the objective is to somehow affect the outcome in a mass shooting and none of the less restrictive alternatives that you suggest will capture any of the people who, based on profiles, et cetera, commit those crimes, then what's the purpose of the less restrictive alternatives? Well, that seems to be saying if the less restrictive alternatives are no good, then why use them? And it's true that if they can show it's their burden and if they can show we carefully considered them and they want work. But there's no evidence in the record that any of the people who they're trying to affect, that is the mass shooters, fall into any of the categories you've talked about. There's no evidence that there was examples of mental illness among them or that, you know, they were on watch lists, et cetera. Even if there were some, Jared Lawson in Arizona, let's take them out. Let's assume 20, 30 percent would be caught by the watch list. That still leaves you a large population of mass shooters for whom the background checks and the watch lists, et cetera, aren't going to do anything. There's nothing in this record. It's their burden. They haven't met it. They didn't consider it. And they're now asking this court to do the work at the Supreme Court and that this court in Bruning says it's their burden to do. They want to do a redo? We can have that discussion at that time. But on this record, we have to win under Bruning and McClellan. I want to change the subject a little bit. One of the things that is discussed in the papers that I want to understand better is common use. One of the things you say in your papers is, you know, millions of weapons are in circulation, held by millions of law-abiding citizens for lawful purposes in their homes. And this is connected to the notion of class of arms, because I am going to refer to the first time. The first time you said that the LTM falls into a class of arms, and I'm trying to understand it a little better. Exactly what are the parameters that you have on this common use and the notion of ubiquitous firearms? Now, in some of the cases, Colby, et cetera, the AR-15 is excised from consideration. The late Justice Scalia talks about military weapons falling into the dangerous and unusual category and not falling within the ambit of the Second Amendment. What I'm trying to understand is this. Heller identified handguns – or, I'm sorry, Heller focused on handguns, obviously a class of arms. The AR-15 in Colby and other cases is a class of arms. When we think of the semi-automatic rifles and the handguns in this case, how should we be thinking about class of arms? Because if those are two examples of class of arms, I don't understand how an LCM could be likewise classified as a class of arms. Thank you, Your Honor. So let me address class of arms, common use, and Colby, if I may. Okay, so on the class of arms, this Court just needs to look to Marzarella. Marzarella gives you the test. It says, is there a functional impact on the category? Is there any functionality to the category of arms that have been banned? There it was, arms with obliterated serial numbers. It had no impact whatsoever on the functionality. And so Marzarella said, for that reason, it was not a class of arms. Here, there is an impact on functionality. You can only shoot 10 bullets at a time. That's their whole case. If there's no impact on functionality, they lose right off the bat because their whole thesis is that this is going to make a difference, this difference in functionality in terms of the number of mass shootings. With every firearm that – let me back up. There are certain firearms that don't use magazines to feed ammunition, correct? A revolver uses – So we're focused on those arms that can only get their ammunition through a magazine, right? So is it your position that any firearm that gets its ammunition through a magazine would be improper to regulate? No, Your Honor, not at all. It would be a class of arms. But remember, that's only part of the test. The other is that it's commonly possessed by law-abiding citizens for lawful purposes. That's why a machine gun is a class of arms. But this court was absolutely right in 1 Palmetto to say, but it's not protected because it's not commonly possessed by law-abiding citizens for lawful purposes. The class of arms is only one part of the burden that we bear. Are AR-15s protected? Your Honor, that issue is not before this court. But in terms of functionality, it would depend on which features – some of those features do improve the accuracy of the firearm. So that is – but that's not – it's sort of the devil's in the details because they're defined in different states in different ways. But let me go to the second question, Your Honor, about common use. That concept's irrelevant because the test is whether it's commonly possessed. And Heller says, quote, for whatever reason, for whatever reason, as long as it's lawful purposes, commonly possessed by law-abiding citizens for lawful purposes. And so how it's used, you know, whether it's target, whether it's hunting, which is one of the – Well, Justice Scalia, I thought excise military use. Well, no, so let's go to Colby then because I think that's sort of a flavor of that. He said M-16s and the like, those that are most useful for military purposes. And what Colby in the Fourth Circuit treated that as like a separate test, saying, oh, well, there are two tests in Heller. There's the test about commonly possessed by law-abiding citizens for lawful purposes, and then there's this most useful for the military. Those are not two separate tests. So are you saying dangerous and unusual is that second test? Because Heller speaks of dangerous and unusual. Right, it has to be dangerous and unusual. And what we say is that these are two sides of the same coin, that the reason that M-16s and the like, the machine guns, are not protected is because they're not commonly possessed by law-abiding citizens for lawful purposes. It's an application of the test that – There are 8 million AR-15s in circulation. The AR-15, according to the United States Supreme Court in Staples, is, quote, the civilian version of the M-16, the civilian version. It is an AR-15. You get one bullet and only one bullet every time you pull the trigger. With an M-16, it's a machine gun. That's a big difference, and that's – But the state of at least the conversation in the circuits at the moment is that an AR-15 is military. What I'm trying to get to is, as we consider this common use in handguns and others, is the way to think about it that either weapons that resemble an M-16 like the AR-15 or weapons similarly situated, if you will, should we excise those on the theory that they're dangerous and unusual from consideration here? Your Honor, that is a separate issue that is not before this court, but to the extent this court were to find that to be persuasive, then that would be a reason to strike down this magazine ban because this state, New Jersey, already has a ban on assault weapons, on the possession by anyone of them. And there's nothing – again, going back to McClellan – there's no consideration of what's the incremental marginal value. You know, one of the questions, Your Honor, was about, well, the universe of people that they're catching up. They're catching up four. There are four in all of American history who have used one of the banned magazines, 11 through 15, for a mass shooting. So that's something to take cognizance of. I want to talk about why strict scrutiny should apply for a moment, if I may, which is that whenever you're talking about targeting of a core feature of an enumerated right, strict scrutiny applies. And more importantly, the concept of burden – there have been a lot of questions about, well, what's the burden on the homeowner? And the concept of burden under strict scrutiny is utterly and completely irrelevant. If there is an invidious racial discrimination against someone, nobody looks at, well, what's the burden? How burdensome was that on that victim of that invidious racial discrimination? And a key case is Reed versus the town of Gilbert from 2015. There it was a First Amendment case where a town had two different regimes. You could have a directional sign for nonprofits, like churches, and then directional signs for everybody else. And there was a distinction. And they said that's a content-based restriction, strict scrutiny. Justice Breyer, in his concurrence, lamented that the majority was not looking at the burden, saying, look, shouldn't we just look to see what the burden is of this law? And the majority said this law, quote, might seem entirely reasonable. And they struck it down. So the idea of a burden – But Heller was focused on the handgun, and the opinion explains why a ban of those was going at the heart of the quintessential self-defense, because of its size, its weight, it's easy to handle, less likely to be wrestled away. How does a large-capacity magazine append to that? How is that core tool to do what it is that the Heller court was trying to be sure was available to a citizen? There are 133 million of these that are lawfully possessed by law-abiding citizens in the United States. And what Heller teaches is that the people, the people have been empowered to make the choice as to what arms, as long as it's an arm that's protected, and as long as they're owning it for lawful purposes, of what they want. And the American people, when they fought 133 million of these, are speaking loud and clear that for whatever reason, and that's the words from Heller, for whatever reasons, these are the arms they've chosen to defend themselves with their homes. That's because at some point they were lawful. Let's assume that there was a point, a particular item that was unlawful, hence unavailable, presumably. You couldn't get it. You're not supposed to get it. Then from your point of view, that statute could not be attacked, even though there was a desire by the citizenry to get access to that. It certainly wouldn't violate the prong of Heller that said that commonly possessed firearms owned by law-abiding citizens for lawful purposes. If it's not commonly possessed, there may be some other problem with it, but it doesn't violate that particular aspect of Heller. One second. Go ahead. Okay, thank you, Your Honor. So I just want to quickly also say about taking, if I may. If there are more questions about the Second Amendment, I'm happy to endeavor to answer them. But on takings, I just want to make one or two quick points. Number one, the takings clause does not permit them to require someone to surrender or modify their property. And here's an analogy I'd like to give, which is if the state of New Jersey told people, you have a choice, you can get rid of your car or you can take out the back seat of your car, that would plainly be a taking. It would be a physical alteration. It's true, you could continue to drive around with a passenger and yourself, but the capacity, the capacity of the vehicle would have been changed. It would have been physically altered, and that would be a taking. Isn't the more apt analogy with the car is you have a really great stereo and we're going to make it an okay stereo? Well, Your Honor. You know, the car still drives. The music still comes through. It just doesn't come through as quickly and as beautifully as you had it before. Well, let's give them a little more. Maybe we're going to restrict your speed to 70 miles an hour, right, which it does affect functionality, but you're really not supposed to be going faster than 70 miles an hour anyway. Classic use restriction. You know, it's the difference between a use restriction and a physical alteration and evasion. Really, the best analogy is you have a van that carries 15 people and now you're told your van can only carry 10, and the state says involve it. By the way, most people don't have 12 kids, so it's really not that big a burden anyway. The reality is it's a physical alteration and horn keeping. Your property is not forfeited, though. Well, it wasn't. Horn is the key. The horns were given the choice of just grow a different type of product on your fields. You don't have to grow grapes. And the Supreme Court said modification, being forced to modify, is a taking of property. We could have an interesting discussion on whether that's an apt analogy, but go ahead. Thank you, Your Honor. The final thing I just want to say is there was some discussion when we were last together about the registration option, and I just want to be crystal clear on this. You know, our position is if there were registration available, that wouldn't be a taking. We would still be able to possess and use it. But this is a null set. They have never been able to point to any magazine that would be available for registration. And if there's any doubt about that, the court could just enter its order saying they're enjoined from taking any magazine that can't be registered. Is it then your representation, then, that all magazines, therefore, can be modified? Permanently modified, yes. You can speak to that with a cross manufacturer? Here's the thing. We've been searching, you know, for the unicorn. We haven't found it. Maybe there is one. There are 133 million. Okay? So maybe there is one. But they haven't been able to identify one. We haven't been able to identify one. Our clients don't own them. And so we certainly, with respect to that universe of magazines, which seems to be all of them, but perhaps it's only 99% of them that can be modified and are required to be modified, then it is a taking. Thank you very much. Go ahead, sir. May it please the court. Jeremy Feigenbaum for Defendant Top Values. As every circuit to consider this issue has determined, under intermediate scrutiny, there is clearly enough evidence to support upholding New Jersey's law, especially in light of the deference owed to the legislature on questions of public safety. Enough evidence. What evidence is left after the district court, to its great credit, found that the experts, and I read that passage to be all the experts who testified, were unhelpful on the specific issue before it? What evidence is left? There's four kinds of evidence in this record, even taking apart the Allen and Kleck. I'll turn to Professor Donahue last, understanding that you read that part of the opinion differently. So separate from Professor Donahue, there are three other kinds of evidence. First, there is other record expert evidence, such as at page 1087 of the record, which is the study commissioned by CNN that does a test of state-by-state analysis of states that have LCM laws and states that do not. There is a hearsay report of a study of an expert commissioned by CNN, not brought into court, I believe not provided to appellants, not subject to cross-examination, we don't have a list of the variables. You could have brought that in to support the law, but you didn't. Normally, that's not, lack of adversarial testing, we don't treat that as enough. I'm not saying it couldn't be. I'm saying on this record it wasn't. Was there any objection to that? I'm sorry. Was there any objection to the use of the reliance on the CNN study? Not to my knowledge, Your Honor. I don't believe that there was. And Your Honor, I would just disagree a bit with some of how the report was characterized. So it does mention some of the variables in the CNN article that were looked at, population and prevalence of gun ownership was mentioned there. It's not peer-reviewed and you didn't provide the underlying data. The kind of ordinary either scholarly or courtroom adversarial process wasn't followed here. There's no evidence that the only evidence that, there's no doctrine that says the only evidence a legislature can rely on in engaging with its analysis is courtroom-tested expert evidence. And so that's simply not the burden that this thing bears here. And that study lumped 10 and 15 capacity magazines together. Yes, it does refer to both 10 and 15 capacity magazines. So we can't just tear them apart into two. It does note for the purposes of whether capacity limits work, which is sort of one of the questions, and then we can separately tease out 10 versus 15. But it does note that capacity limits are effective and that you'll see a 63% lower rate of mass shootings in the states that have capacity limits compared to the states that do not. So that was obviously evidence the state could rely on to believe that capacity limits were themselves effective. And there'll be more evidence we can turn to about the 10 versus 15 question in particular. Now beyond that, there's other evidence in this record from experts. At page 30 of our brief, we note a New York Times survey of experts that were asked to rate a range of firearm safety laws. And they rated capacity limits as the most effective way to tackle mass shootings in this country. And the other kind of evidence, which builds on the expert evidence that we're talking about, is law enforcement evidence. So in this record, you can find declarations and testimony from the Baltimore County Police Department Chief, the Baltimore City Police Department Chief, the Clark County Nevada Sheriff, a Colorado U.S. Attorney. This is 865 of the record, 919 of the record, 1027 of the record, all confirming their views that in their experience, both capacity limits will not impermissibly burden self-defense and that they will help mitigate the lethality of mass shootings in this country. So that's sort of law enforcement evidence that a state is certainly free to rely on based on their expertise in this area. And then the third bucket of evidence that I would note, before again turning to Professor Donohue, is that every circuit to consider the question and address these facts, canvassing the same studies, the same law enforcement declarations, and testimony have all found that a legislature like New Jersey is free to find that capacity limits will be effective. Okay, let's imagine we have a sex classification, all right, that only males have the capacity to be firefighters, but if women pass a special physical test, they can become firefighters because then they can show they have the upper body strength. So not an absolute ban on them, but just a limitation of women becoming. My read of cases like Frontiero is, you might get police fire chiefs who testified, in my experience, men make better firefighters. I found a few exceptional women who did. You might get a survey that said that the best way to make sure that people get carried out of burning buildings is to have male firefighters carry them. You might have several other courts that upheld them at the time they did. The intermediate scrutiny case law says that's not enough. It's a statistically predictive generalization, but it's still not enough to show that you have to pursue this as the means of ensuring that firefighters are strong enough to carry people outside of buildings. So the kind of evidence you see is not nothing, but historically it hasn't been enough to satisfy an intermediate scrutiny. So your Honor, this court has been very clear that the way you handle Second Amendment intermediate scrutiny is not necessarily a one-to-one with sex discrimination. No, you are then saying that intermediate scrutiny here can't mean the same thing it means in First or Second Amendment. I'm not saying that it can't mean the same thing. So if you look at the intermediate scrutiny cases in the sex classification context, those cases are very clear that a lot of the analyses that have been done were infused with sex stereotyping. There's no evidence here that sort of this analysis was done with infused stereotyping about the Second Amendment right. And so there was a different danger that cases like Frontiero were combating. In this case, this court's precedents are clear on the way to handle these sorts of questions in the Second Amendment context, and every circuit has agreed. So if you look at the Drake case, the Drake case is explicit that the legislature is the one that's supposed to address conflicting questions of empirical evidence, which is exactly the sorts of things that a panel suggests are in this record. And you also see cases like FIAC or the Second Circuit case, NYSRPA, that are saying there is proper deference to the legislature for making predictive questions on public safety. And the truth is, Your Honor, you can't expect controlled experiments in a context like firearm safety. And so in certain contexts where you might imagine that there would be controlled experiments, you simply can't have one under institutional review board norms. But you can have natural experiments. Some states have adopted these, some haven't. We had a federal firearms ban for 10 years, a large-capacity magazine ban for 10 years. So you don't have to do controlled experiments, but you have natural experiments, and you don't have the evidence in the record that you could have from that. I can't agree with that premise, Your Honor, because Professor Donahue, in this record, lays out that the federal ban was significantly more effective than appellants suggest. So he notes that from 1994 to 2004, the 10-year period of the federal law, there were 12 mass shootings and 89 deaths. Yet from 2004 to 2014, 10 years after the lapse of the federal ban, there were 34 mass shootings and 302 deaths. And that's at 909 to 911. When I read his cross-examination, that's about 20, 30 pages in the record after that, I read him to concede, yeah, this is not actually based on the specifics. I haven't been able to control for those other things. I can't say with confidence that the federal ban itself was the cause of that. Your Honor, you're right that he can't control for the other things because he was comparing 10-year periods, but that's the natural experiment you were asking about, different from a controlled study. And so if you look at other natural experiments that have been done, Luis Clarivas has a book, Rampage Nation, that we mentioned in our brief at page 32, that refers to the same analysis and says he found staggering results at the time period between the federal ban and the lack of a federal law. So during the federal law, the number of mass shootings went down 37%, and deaths from mass shootings went down 43%. After that law lapsed, mass shootings went up 183% and deaths went up 239%. So that's additional evidence by experts reviewing the sort of natural experiment that you're referring to that again found that the federal ban was significantly more effective than appellants suggest. And they rely on Professor Koper to suggest that he could not, quote, clearly credit the federal law with a drop in violence, but Koper was quite specific that he thought the law may prevent some shootings because the LCM ban was, quote, the most important part of that federal law, and that because of a grandfather clause in the federal law, he would expect to see some of its results happening more slowly. And so that's why some of the subsequent evidence, like the 2016 book, Rampage Nation, that I'm referring to are that sort of subsequent analysis that he teased would happen. And so if you look at page 1087, that sort of CNN article we've been talking about, there is a quote from Koper, again, suggesting that LCM laws are likely to be effective, and that's what the state-by-state analysis shows. How do you respond to your adversary's challenge that there was no consideration of alternatives, as he suggests is required by Brody? So I think that's simply not right, Your Honor, and the district court found, as a matter of fact, that that wasn't right because the district court lays out exactly what we suggest. So the district court made a specific factual finding based on Professor Donohue's analysis that the majority of shootings that have taken place in America were perpetuated by previously law-abiding citizens. And so when you walk through each of the various analyses that we're talking about, a background check, even a background check with a renewal period, a test about whether the restriction is inside the home or outside the home, none of those speak remotely to the problem of the previously law-abiding citizens because there's no way to guarantee that someone who previously wasn't a felon or previously wasn't discovered to have an episode of mental illness won't in the future engage in a mass shooting, and that's unfortunately what experience has taught us. Let's add specifically, New Jersey has a law that we blessed in Drake. We said it's constitutional to have a May issue rather than a Shell issue. In that law, in case it's outside the home, it's a pretty small sliver of people who qualify under May issue, right? We said the civilian FBI employee wasn't a former kidnapping victim, didn't satisfy, etc. So I take it that the May issue satisfies your concern outside the home, and then your case boils down to in the home, there's a danger of law-abiding people misusing it, and there's a danger of their being stolen, correct? Well, it's also the danger that someone who was previously only keeping an LCM in the home is going to then use it in a mass shooting. Sorry if that was the first part of your question. I'm saying that basically. So would an extension of May issue to the home then satisfy that? There's a small number of people who are going to have a May issue, who would satisfy May issue, and yet the people who satisfy May issue are the ones who have a powerful rationale for having this, someone who's being pursued by a group of four people after an abused woman escapes from the clutches of a drug gang or something. So there are obviously incredibly compelling stories for individuals who have gotten the May issue licenses that you're referring to, but there isn't the evidence that that's going to be a more effective way of preventing the problem of mass shootings in this country because it doesn't guarantee that that individual is not going to lose their LCM or that it's going to be stolen going forward. It doesn't guarantee that that individual who at that original screening appeared like a completely law-abiding citizen will not one day end up engaging in a mass shooting. Your articulation now sounds like it flipped the burden of proof. It doesn't guarantee. They haven't shown that. But I thought the obligation was on you to show that you have examined these other alternatives the legislature has and has decided that they are inadequate. Do you disagree with your brethren on the other side that the burden is on you here about less restrictive alternatives? No. The second step of the Marzarella framework, the state bears the burden, and we've never contested that. We just simply think we're able to meet that, including based on the sort of logical reasons to understand that another alternative would not simply solve the problem. And that's explicit in the Florida Bar versus Wentworth case, that logic and common sense is a part of the legislative arsenal here. And so when you look at the sort of reasoning behind the proposal that you simply extend the May issue regime to in the home when it comes to LCMs, you will readily see that because the problems that end up with criminals having LCMs are theft, and the other problem for mass shooters is the 71% figure Judge Schwartz referred to earlier for previously law-abiding citizens, that when you take those two ways of arming criminals or arming mass shooters in this country, you readily see that the May issue system cannot work as well as a capacity limit, and that's why every court to consider the question has upheld these laws in intermediate scrutiny. Let me back up for a minute. You know, what we have suggested in cases like Marzarella is that we first look at whether there's a substantial or a severe burden on the core of the right, and then we decide what the level of scrutiny is. And you've also suggested, well, we have to figure out how important this is, and then we decide what scrutiny we're across. And you're coloring within the lines of what we suggest in these cases, but there's a circularity in our cases. It seems odd to not first decide that strict scrutiny applies or intermediate scrutiny applies and then apply a level of scrutiny here. And I don't take you to be contesting the premise of Appellant's case, which is this does impose some limitation on someone's ability to defend his or her home. Do you dispute that? At most a modest one. We've only identified two instances where someone fired more than ten shots. But this is not like Marzarella, where there's no functional effect on defending the home. There is some effect. A non-zero set here. This isn't like simply not having a serial number. Why are we not in strict scrutiny land, at least in the home? So Marzarella was explicit that the test is not simply inside the home or outside the home. It's whether or not the restriction at issue severely burdens the core right. But that's the circularity I'm talking about. It may be that as a matter of a panel of the Third Circuit, you can argue about how we should interpret it. But I'm all nervous about interpreting Marzarella in a way that makes our law circular and imports the interest balancing that Heller said we shouldn't. That sounds like Justice Breyer's dissent in Heller. So I have two explanations for that. One is sort of on the first principles, and then one is the way the other circuits have addressed this exact question. So the first is on the first principles. There isn't an inherent circularity to this analysis because to ask whether there's a severe burden on the right is to then find out what scrutiny is applied to whether or not this will actually achieve its desired goals. So you can do the analysis about the burden on the right to self-defense in the home before you decide how strict your scrutiny needs to be to whether this will work to achieve its ends at all. So there are actually two different questions that you're asking at each of the steps. I would get dominionist, trivial, no effect. Marzarella, it doesn't seem to matter what you do there. It doesn't affect defending the home. But when you start importing words like severe, it does sound circular to me. So I think this gets to my other explanation, which is what Heller, too, the D.C. Circuit's opinion on point made clear in this case, which is they did an analogy to the First Amendment on this particular point and said that when you have a sort of time, place, manner, or modest burden on speech where you're free to exercise your speech in a variety of ways and there's only a modest burden, you're going to apply intermediate scrutiny. And as the district court found in this case at page 27 of the record, an individual wishing to engage in self-defense in the home can own as many guns, as many magazines, and as many bullets as that individual chooses. It's simply that that individual cannot fire more than 10 bullets at a single time without taking the time to reload their weapon. Right. So that, though, I mean, the problem is you want to say there's, you know, effect on both, but that's also going to impair the ability of mass shooters. So then the whole mass shooter case comes down to the magazine changing time because the mass shooter can buy a bunch of weapons. In these mass shootings, typically, there are a bunch of weapons. And then it requires us to do inferences about how often the mass shooter's going to get So I hear you to be getting at whether or not there's a sort of inconsistency in that position, but I do not think there is for us. And it's a question, obviously, that could be asked of either side. But the reason there's no inconsistency for us is that we are saying that there is a pause to reload your weapon, but we're saying that when you take a look at the record, there are almost no instances of anyone ever having to fire more than 10 bullets in self-defense. And instead, as Heller too found, relying on the D.C. Chief of Police, it's actually dangerous to keep firing so many bullets in self-defense because of the risk that that would pose to bystanders. So our position is, a mass shooter, we know is trying to get off as many shots as they might be able to do in as limited a time as they have, whereas it's simply not the case for a self-defender. And that actually ties directly to why reducing the limit to 10 from 15 will be particularly effective in this case, which is, as Professor Donahue explained, and as law enforcement, like the Baltimore Police Department Chief, have agreed, increasing the number of pauses that you will see during a mass shooting episode increases the number of opportunities for an individual to get away or for law enforcement or a bystander to try to intervene to end the mass shooting. And so I understand appellants have pointed out that the record contains evidence of four episodes of a mass shooting with someone using a 15-round LCM. But in this case, if someone's using a 30-round LCM, it's about the number of pauses that you would see in the interim time. So it's not just the number of times someone has used a 15-round LCM. It's about what the difference would be between a 15 and a 10. And so when you reduce someone to only having a 10-round LCM, they're able to get off fewer shots during their attack. What's your response to the circumvention issue? You know, the slogan, the law-abiding citizens are going to be bound by this. The criminals, if there are millions of these in circulation, are going to get them anyway. So why do we think that there's actually going to be a meaningful effect on the mass shooters' access to the magazines? So I think Judge Easterbrook's opinion and Friedman's really gives both of the perfect answers to this. The first is that that would prove far too much, that appellants are suggesting you could simply go to a different state to try to circumvent this law, but that would undermine any state's ability to pass new regulations of individuals who are able to own firearms or of the kinds of firearms that those individuals could own. So it would be the same reason why you would say that a ban on certain kinds of felons in possession wouldn't work because they'd simply circumvent it. But every court has consistently upheld those. So the argument proves far too much. But second, there's also empirical evidence that Judge Easterbrook points out that a lot of individuals are accessing their firearms locally and are engaging in their crimes locally. And so that's why you see things like the study we refer to at 1087 of the record that actually does find a correlation between these LCM laws and whether or not the state sees a higher rate of mass shootings. William, in your favor, do we have to deem LCMs to be dangerous and unusual? You do not. You can simply skip the first step and rule on the second step by assuming without deciding their common use analysis, whatever have you. You do not have to do the sort of Colby analysis. We think the Colby analysis is an accurate way to tell her and a perfectly fair way to resolve this case. But this court could simply assume without deciding that we're actually wrong on the first step and rule for us on the second. So the discussion that I had with your adversary I'm trying to figure out if it's one that's either necessary or meaningful here. Colby talks about the AR-15 as a reference by Justice Scalia and Heller to military or military-like rifles. Your adversary talks about the ubiquitousness or ubiquity of weapons. And I'm wondering, as we think about class of arms, handguns, semi-automatic rifles, and now presumably LVMs and that class of arms, should we be thinking about from that universe there should be certain weapons that should be excised from our consideration here or is that just not a question before us and not worth our sort of time in whatever decision we come to? With apologies, Your Honor, I'm not sure I understood what you meant by excising from consideration. Are there certain weapons we should say are too dangerous for our Second Amendment protection? Colby says think of AR-15 as dangerous and unusual so it's not protected and so it goes in that direction, if you will. Handguns, according to your adversary, fall under Heller. They are protected. I understand your argument that LCMs would not be. I totally get that. I'm just trying to figure out should we be thinking about the universe of class of arms affected by this as just one whole and not think of separating it out? I just want to know, are those useful distinctions or not? Obviously, I don't think this Court needs to go all the way on the weeds on the way to tease out the Step 1 analysis given the other grounds that are available to this panel here, but I do think that if you're teasing it out, it is important to note that there are going to be certain kinds of weapons that categorically should not get Second Amendment protection based on their extreme dangerousness and their analogy to military weapons, which is exactly what the Colby Court in the Fourth Circuit explained, that there are certain weapons that are particularly lethal, particularly inappropriate for self-defense use in the home, pose particular dangers for law enforcement. So a perfectly good example might be the plastic weapons that the state of New Jersey recently passed a law to regulate. They're weapons that don't have any metal components, meaning that they could get through airport security, they could get through courtroom security, government building security, and the like. If you take Appellant's arguments to the logical conclusion, you would say, okay, well there is a class of arms that does not have a metal component. That is, if it becomes popular elsewhere, let's just say other states don't regulate it, it becomes popular elsewhere. If it becomes popular elsewhere, it's now a popular, commonly owned class of arms. The state of New Jersey can do nothing about it. And in fact, what would be especially weird about that logic would be that even if New Jersey could regulate it right now, if these plastic weapons gained in popularity in other states in 15 or 20 years, it appears that our law would then become invalid because they're now a commonly owned weapon, a feature that I've never seen before in Second Amendment analysis, but is the sort of logical consequence of Appellant's argument. So I do think it's important to place some happening limits on Appellant's common use test, which as just Easterbrook pointed out, is also pretty circular. I take the difference to be that it's not at all obvious to me what the defensive property is of a plastic weapon, whereas your own expert can see that there's a defensive property to having a larger capacity magazine. But your point is well taken that the way that we craft our class of arms ought to take into account features like that that might be reasons to regulate. Yes, I certainly think it would. Look, Appellant also put forward a test like maybe if an integral feature are now relevant to defensive gun use, it would put the court in the position repeatedly of deciding which features of a gun are integral or optimal or ultimately support stronger offensive gun use. And I think those are some tricky and thorny questions this court may not want to engage with and simply does not need to engage with within the contours of this particular case. So the magazine as a general matter without limitation to capacity, just a magazine, which is a modality to cause ammunition to get into weapons that have to accept it. Is our magazines a class of weapons? And is this a categorical ban on a class of weapons? In the New Jersey statute. So if magazines are the class of weapons, we certainly don't think this is a categorical ban. I mean it's a safety limit on the number of ammunition or the number of bullets or amounts of ammunition that's a magazine that you could have a magazine lawfully holding. So it's a limit that goes down from 15 to 10. It's much more of a safety limit on weapons than a ban on an entirely new kind of weapons. And that's how we explain it in our brief. But again, not necessary to get into. Dangerous and unusual. You've bypassed this. But you concede it has to be both dangerous and unusual for us to regulate it. To treat it as within a Heller exception. So the court uses the phrase dangerous and unusual. We don't concede though that unusual means this sort of commonly owned numbers analysis. So you want some analysis other than the statistical prevalence of a gun for unusual. What's your authority for that? Yeah, so we have a couple different authorities for that. But I'd leave with Marzarella. Where when Marzarella does the analysis, I'll just say what it says about short barreled shotguns. Analysis about short barreled shotguns is that they're dangerous and unusual. And that their concealability fosters their use in illicit activity. And that it is also dangerous and unusual because of its heightened capability to cause damage. You don't ask any questions in Marzarella about the number of short barreled shotguns that were owned in the country. And asking that sort of question as Judge Easterbrook pointed out is inherently circular. Because the number of weapons that are owned in the country has everything to do with which weapons are lawful and which ones are not. Well Judge Mannion pointed out, I mean in the Fourth Amendment reasonable expectation of privacy. We do that all the time, right? People's expectations are shaped by how long the iPhone has been out there and taking pictures and doing other things. So this would not be the only place in the law where we do that all the time. So there's really nothing in the text of the Second Amendment and we don't think the phrase dangerous and unusual is nearly clear enough to sort of impose a subjective reasonableness requirement into the Second Amendment. Can I just go back to the magazine class conversation? Magazines is a general proposition in the class. Your view is this law doesn't categorically ban magazines because it allows for people to have a capacity to limit its magazine. Are large capacity magazines a class of weapons? So we don't think they are. Appellants suggest that sort of LCMs are themselves a class of arms specifically because we have defined them as such. But that's simply the mechanism by which the legislature is regulating the capacity limit in the state. They have a definition that says you can't have a large capacity magazine and then in the definition section they say that's one that they used to say 15 rounds. Now they say 10 rounds and simply lowering the capacity limit in the state. It's not like the state legislature is definitionally creating a new class of arms and I suspect appellants like the state wouldn't think the state should be the one that has the definitional power to create what classes of arms exist. I'd like to follow up on something else that Judge Bavis was asking about. It goes back to the strict scrutiny point. This law regulates what a law buyer can have in his house or her house. My first question is would you analogize large capacity magazines to the handguns that Heller called the quintessential self-defense weapon and if not, why not? Thank you, Your Honor. And this teases out something that you mentioned to appellants which is that we believe that the differences between the LCMs in this case and the handguns at issue in Heller are myriad. So, if you read page 629 of the Supreme Court's opinion in Heller, it lays out exactly why handguns were different and why a ban on handguns in the home was particularly onerous for self-defense. Handguns, not only were they the number one weapon used for self-defense in the United States, but they were actually better for it. They are easier to store in readily accessible locations. They cannot as easily be redirected or wrestled away by the attacker. They are easier to lift for a person of small stature and they are easier to lift even with one hand so an individual can use their other hand to call the cops. Now, large capacity magazines are none of those things. So, as the record shows, over a four-year period under the NRA's own self-report database, there were 736 defensive gun uses and only two of them involved firing more than 10 bullets where the average was between two and three, maybe 2.1 or 2.6 depending on where you look. Now, appellatives suggested an argument that the actual number is 4,663 defensive gun uses a year for self-defense in the U.S. But they do that by taking CLEC's overall analysis of defensive gun uses and then take the 2 out of 736 number that Allen identified in her study. And as Professor David Hemenway of HLS found, this is at 1010 and 1013 of the record, CLEC's numbers, the denominator, have never been validated and multiple external efforts to validate Dr. CLEC's numbers have fallen short. And so, when CLEC was asked, can you identify any instances in which Dr. CLEC's numbers  able to identify any instances above the two that Lucy Allen pointed to for self-defense in the home with more than 10 bullets, he was not able to identify any. And if they're right about their number, it would be about 18,000 in four years and it would be reasonably shocking that appellants and their own expert in this case and in other cases is unable to identify any others. And the last thing I would just note on that point in the way that handguns are different for self-defense than LCMs are is that law enforcement agrees on this. So, the Baltimore Police Department Chief at 1024 of the record says that there's no need for more than 10 rounds to be fired in self-defense and has identified zero instances in which he has seen that. And also, that the Baltimore Police Chief at 1025 of the record agrees with the D.C. Circuit that actually using LCMs in self-defense would be dangerous because of the risks posed to bystanders. So, it was a slightly long-winded answer there, but there are significant differences between handguns and LCMs. So, is that your basis? Well, let me ask it without telling you what I thought you said, but you tell me why is this law if it regulates something in the home not subject to strict scrutiny? Is it because it's not the kind of handgun that Heller was trying to protect? Yes, so it's not the kind of handgun that Heller was trying to protect, but at a higher level of generality because, as Marzarella put it, you're looking for more significant burdens on the core right in order to trigger strict scrutiny based on the analogy to the First Amendment that the D.C. Circuit drew and you simply don't have that here whereas you would have had it for handguns and Heller. Counselor, we've already talked about the circularity. I won't belabor that point, but what I worry about is your focus is on the discharging of the bullets, but the Second Amendment says, keep and bear. That means, I think, possess and use. So, the ability to possess the potential to fight off larger attackers, I mean, maybe it satisfies strict scrutiny or maybe it satisfies immediate scrutiny, but that itself is protected and your analysis has been going straight to whether, in fact, that many bullets need to be fired. Yes, but that's because in the way this analysis works, we're trying to find out how far the burden goes. So, we don't contest that heightened scrutiny as appropriate. And we've applied intermediate scrutiny in our briefs, specifically because it involves use in the home, and so we don't quibble with that at all. But as third-circuit cases have pointed out, and I understand your view that Marzarella had a circular point here, but as third-circuit cases have pointed out, in figuring out whether you're using strict scrutiny or intermediate scrutiny within the heightened scrutiny framework, you're looking for how severe the burden is, and in this case, there's simply not a severe burden, and the way you know it's not a severe burden is because of how often you would even need to use such weapons. When you say that that question precedes the home analysis, what's the burden? It's not a, it affects your right in the home, it goes straight to strict. It's got to be, what's the burden? We ask what the burden is on self-defense in the home. So, they're linked together as part of one question. And yes,  And then, you would go into, okay, at intermediate scrutiny, have you done enough? The state, which we accept the burden, says, yes, we've done enough to show that this is reasonably likely to advance public safety. And based on the evidence for the legislature, based on the evidence in this record, based on the evidence in the records across the other circuits to consider the question, we think there is enough. I'd like to turn very briefly to equal protection because I know it came up briefly at the last argument, and I just wanted to clear up one thing about the distinction between retired law enforcement officers and veterans, and between veterans and active military. So, we, one of the potential questions that a judge could ask in this case would be about the veterans, why there is no exception for veterans in this case, where there is one for retired law enforcement officers. And our view is that that distinction is supported by the difference in training. And again, this is a rational basis. So, when you talk about training, I just want to understand,  that in the category of persons who the exception applies to, they enjoy, endure, whatever verb you want, regular training on a regular basis is a good thing. And it's not over a period of time, and it's not a training session that everyone can take, but it's whatever, monthly or quarterly training that... The semi-annual requalification. Right. Exactly. You know, the simulation of situations that may arise and so forth, and that applies to that category of persons and it doesn't the other, and that's the distinction. You said it better than I was about to, so that's exactly right. The reason now, I understand there was some question about veterans versus active military, which weren't distinguished on training in the same way. So, I just wanted to explain how the exception for active military works, which is not that there's a special 50-round LCM exception for active military. Active military are exempted from the whole gamut of New Jersey firearms restrictions, whether it's assault weapons or trigger activators or what have you. They're broadly exempted from state firearm laws, specifically for their service weapons. So, in the language of the statute, weapons authorized under the relevant military or law enforcement orders and only if actually on duty or traveling to or from an authorized place of duty. Now, it's perfectly fine not to extend that to veterans because they don't have service weapons and they're not traveling to or from duty. So, there's no reason to be concerned about the veterans versus active military distinction and the other distinctions are supported based on training. I'm good. Thank you. I'm done. Thank you. Thank you. Thank you, Your Honor. I've got 14 points in three minutes, so I'm going to talk fast. So, there was some discussion about deference and there was no deference in Heller even though there was a mountain of evidence about the dangerousness of handguns and the Supreme Court said it would have failed any level of scrutiny including intermediate scrutiny. There was no deference in McCullen. They had to, there was a rigorous examination of the state's considerations and in VMI there was no deference. There was discussion about the CNN study. That study cuts our way. It treats 10 and 15 round caps the same for purposes of that study. Likewise, the New York Times survey draws no distinction between 10 and 15 round magazine caps. Again, law enforcement, we were told about these affidavits. None of them address 10 versus 15 round magazine capacities. We were told that the other circuits have gone the other way. Well, in Heller, nine circuits got it wrong and respectfully we would say then Judge Cavanaugh's dissent in Heller 2 is the most wrong. Intermediate scrutiny in VMI could be distinguished because of stereotypes. What the state is advocating for is watered down intermediate scrutiny. As I said, if you look across intermediate scrutiny, it is rigorous and there is no basis for treating the second amendment as a second class right. We were told there were natural experiments even if there weren't empirical studies, there were natural experiments. Well, New Jersey has had a natural experiment for 28 years. They have had a 15 round cap and zero mass shootings. We were told that . . . . . . . . . . there is no distribution . . It doesn't meet their definition. Here is the point 30 round magazine cum comm comm . J A . . . Summary   strongly support this argument. That was a 106 page study. We were told time place and manner. There is in he be purpose. There are no limiting principles and the perspective of the criminal not the law abiding citizen. It looks at it from how is the criminal going to misuse the firearm. That was the district of Columbia's entire pitch was to say over and over again criminals prefer handguns and the Supreme Court said it does not matter. What matters is the people want them in their home. I'm out of time. May I have another minute? Yes. Thank you, your honor. I sincerely appreciate that. With respect to circularity Justice Breyer made this point. It was rejected. The people are trusted to make the choices they want. With respect to circumvention we were told it proves too much. Here we have highly motivated individuals and 133 million of these magazines. Our argument does not prove too much. Here is the last point. They say that the core only applies to possession of handguns in the home. At the core of the second amendment is the right to use arms, arms, not handguns, arms in defense of hearth and home. They have never contested that these magazines are not for possession of firearms. Binder makes clear this strikes at the core and must be treated under strict scrutiny. Thank you very much. Thank you. Council, thank you for spirited argument. We are taking the matter under advisement but the amount of time under advisement is going to be truncated. It would be helpful if you would order a transcript and we will get back to you as quickly as possible. Happy holidays.